IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| J.P., by his foster mother and next friend, ALISHA OGDEN, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )     **Case No. 4:20-cv-00189-NKL** ) |
| BELTON SCHOOL DISTRICT 124, | ) ) |
| Defendant. | ) ) |

## ORDER

Before the Court is Plaintiff J.P.'s Motion for Judgment on the Administrative Record or, in the Alternative, Summary Judgment on Count 1 of His Second Amended Complaint, Doc. 186, and Defendant Belton School District 124's Motion for Judgment on the Administrative Record or, in the Alternative, for Summary Judgment on Count 1 of Plaintiff's Second Amended and Motion for Summary Judgment on Count II of Plaintiff's Second Amended Complaint, Doc. 184. The Second Amended Complaint (hereinafter "the Complaint") states two claims: An appeal from the decision of the Administrative Hearing Commission affirming the District's decision to move Plaintiff from Kentucky Trail Elementary School to Trails West, a state-run school for the Severely Disabled (Count 1); and (2) a retaliation claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, and § 504 of Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.* (Count 2). For the reasons stated below, the District's Motion for Judgment on the Administrative Record on Count 1 and its Motion for Summary Judgment on Count 2 are granted, Plaintiff's cross-motions are denied, and the claims are dismissed with prejudice.

### I. Background

Case 4:20-cv-00189-NKL   Document 226   Filed 08/13/21   Page 1 of 34

Plaintiff J.P. is a 10-year-old boy in the care of his foster mother, Alisha Ogden. Doc. 29-1, at 1.[1] Alisha Ogden is a 40-year-old woman who lives in Belton, Missouri, where she cares for Plaintiff, two adopted children, another foster child, and her natural child. Doc. 187-7 at 2-3. At the time of the administrative hearing, Plaintiff was 9 years old. *Id.* Since February 20, 2018, he has attended school at Kentucky Trail Elementary School, a school in Belton School District 124 in Cass County, Missouri. Doc. 29-1 at 2, Doc. 28-2 at 206. He was in fourth grade during the 2019-2020 school year. *Id.* at 1.

Plaintiff is profoundly disabled. He has been diagnosed with cerebral palsy, microcephaly, and epilepsy. *Id.* He is almost entirely non-verbal and lacks any functional communication skills. Doc. 28-2 at 394-395. He requires constant adult assistance in every aspect of his life, including eating, toileting, and cleaning himself. At the age of seven, developmental behavioral experts determined his cognitive level were equivalent to a three-month-old or a six-month-old infant, and that his gross motor skills were equivalent to a one-year-old child. *Id.* In 2016, his IQ was measured at 36. Doc. 29-1 at 3. He does not participate in the general curriculum of his school in any way. Instead, he spends all classroom time in a contained special education classroom where he is given individualized instruction by a rotating team of specialized instructors and therapists. Doc. 28-2 at 32. Although he shares this room with approximately twelve other disabled students who rotate between that classroom and the regular classroom setting, he is isolated from other students in the room because "his programming requires a completely different type of instructional approach than all the rest of the students in the class." Doc. 28-2 at 32-33, 309. He is attended to by a

---

[1] For purposes of Count 1, the Court relies exclusively on the 3173-page Administrative Record compiled by the Commissioner. The Administrative Record is sealed to protect Plaintiff's privacy, but the Court will quote from it selectively as it is contained in Docket Entries 29-32. Document 29-1 contains facts stipulated to by the Parties.

paraprofessional every moment he is at school. Doc. 28-2 at 206. He does not attend art class, music class, P.E., or assemblies, and his interactions with non-disabled peers are limited to incidental contact in the hallways and during recess. Doc. 28-2 at 286-287, 308-309. His ability to interact with others is limited because too much sensory input will cause him to cover his ears and fall to the ground. Doc. 28-2 at 246. The simple act of someone walking into the special education classroom can take him completely off task. Doc. 28-2 at 376. His sensory issues often lead to bouts of vomiting and cause him to bite others, requiring District employees to wear bite guards when assisting him. Doc. 28-2 at 376, 401. Instances of biting and scratching District employees have resulted in injury reports and worker's compensation claims. Doc. 185-1 at 2.

### A. Facts Related to the Administrative Decision

### 1. Kentucky Trail Elementary School

Plaintiff arrived at Kentucky Trail sometime in February 2018. Doc. 28-2 at 20-21. Due to his disabilities, an Individualized Education Plan ("IEP") was created for Plaintiff Doc. 29-1 at 2. Plaintiff's IEP Team included Alisha Ogden, Jessica Hoots, the District's Director of Special Education, Elizabeth Hart, a special education teacher, Lori Rodgers, an IEP coordinator, Denise Sterling, a speech pathologist, Susan McAllister, an occupational therapist, and Cari Dunn, a physical therapist. Doc. 29-27 at 58-59.

On March 22, 2018, his IEP Team agreed on and set out the following six goals in his IEP:

Goal #1:

> Functional Skills: given instruction and practice, [J.P] will increase his functional skills by engaging in a functional activity (pushing buttons, filling/dumping containers, grasping a writing tool and taking it to paper, opening/turning pages in a board book) for up to 5 minutes on 4 of 5 trials on 4 of 5 data days by the end of the IEP year. Baseline: 30 seconds.

Goal #2:

Functional skills: Given instructions and activity, [J.P.] will grasp a pre-loaded feeding utensil from his tray, take a bite, and return the utensil to the tray on 4 of 5 opportunities on 4 of 5 data days by the end of the IEP year. Baseline: [J.P.] requires physical assistance to use feeding utensils.

Goal #3:

Language: In order to improve language skills [J.P.] will use eye gaze and/or touch to choose between two activities on 2 out of 3 opportunities on 3 consecutive data days by the end of the IEP year.

Goal #4:

Language: In order to improve language skills, [J.P.] will use a variety of switches to ask for more, make choices, and operate cause/effect activities, on 2 out of 3 opportunities, 3 consecutive data days by the end of the IEP year.

Goal #5:

Gross Motor: [J.P.] will demonstrate increased trunk strength and muscle control by independently maintaining static and dynamic sitting with upright posture in wheelchair and adapted seating or standard classroom chair for 5 minutes while performing functional activities (feeding, table top activities, pre-writing) and maintain standing at support surface with contact guard assistance/supervision for 2 minutes on 2 of 3 trials on out of 4 consecutive data days per IEP year. Baseline: [J.P] inconsistently maintains static sitting with upright posture for 1-2 minutes. He maintains standing at a support surface for approximately 30 seconds with minimal assistance.

Goal #6:

Gross Motor: [J.P.] will demonstrate increased locomotion by safely walking 50 feet with reverse rolling walker, steering around obstacles with close supervision with less than 3 verbal cues to maintain grip on walker and maintain upright posture on 2 of 3 trials on 3 out of 4 data days per IEP year. Baseline: [J.P.] walks 10-15 feet in his reverse walker, without steering around obstacles, with minimal assistance to guide and/or maintain forward movement. Multiple and frequent physical and tactile cues are required to maintain grip on reverse rolling walker.

Doc. 28-2 at 306-08.

## 2. School Placement Dispute

On May 15, 2018, Ogden was notified that the District was considering whether Plaintiff was eligible for placement at Trails West, a state school intended only for disabled students run

under the Missouri Schools for the Severely Disabled ("MSSD") program. Doc. 28-2 at 239; Doc. 29-1 at 3. On September 14, 2018, the IEP Team met to discuss whether Plaintiff should be placed at Trails West or remain at Kentucky Trail, but no final decision was made. *Id*. On October 15, 2018, the IEP Team (without Ogden) met again and formally determined Plaintiff should attend Trails West. Doc. 29-1 at 4. It notified Ogden of that decision two days later. *Id.* On October 24, 2018, Ogden filed a Due Processing Hearing Request challenging the IEP Team's decision under the IDEA. *Id.* Ogden dismissed that due process complaint on December 3, 2018, with the understanding that Plaintiff would stay at Kentucky Trail until Plaintiff's functioning and progress toward his educational goals could be reassessed. *Id.*

On May 17, 2019, after a total reevaluation of Plaintiff's functioning and behavior, the IEP Team notified Ogden that it still intended to send Plaintiff to Trails West. Doc. 28-2 at 263. In response, Ogden filed her second Due Process Hearing Request on May 24, 2019. *Id.* Ogden dismissed that complaint on July 22, 2019, on the understanding that the IEP Team would again reassess its decision after considering her input regarding Plaintiff's functioning and goals, and that Plaintiff would stay at Kentucky Trail until then. *Id.* at 363-64.

On August 23, 2019, after seeking and receiving Ogden's input, the IEP Team stood by its decision to place Plaintiff at Trails West. The IEP Team thought the change appropriate "because [Trails West] will provide immersive and comprehensive instructions and services to meet his specific needs at a level" that Kentucky Trail could not provide. Doc. 28-2 at 241; Doc. 29-1 at 5. It found "[t]he high level of support at the Public Separate School will increase his opportunity to meaningfully benefit in the implementation of his IEP, resulting in greater independence due to the increased adult to student ratio." *Id.* The IEP Team considered his current placement at Kentucky Trail inappropriate because Plaintiff's "cognitive and adaptive functioning is so severe

5

that education in general or special education classes in the District . . . cannot be achieved satisfactorily" and that his current placement "will not result in any meaningful benefit[.]" *Id.* The IEP team stated that Plaintiff had made only limited progress in achieving his IEP goals. The IEP Team found that the progress he had made on Goals 5 and 6 (both gross motor goals) were attributable entirely to natural physical development and maturation, not to the instruction he received at Kentucky Trail, Doc. 28-3 at 48-49, and did not represent real progress appropriate in light of his particular circumstances. The IEP Team found that Plaintiff had regressed in the areas of communication, daily living, socialization, and motor and overall adaptive skills. Doc. 28-2 at 242; Doc. 28-3 at 119.

On August 29, 2019, the IEP Team notified Ogden of its decision. *Id.* at 364. Its notice stated that "The IEP team determined Public Separate School placement is appropriate for [J.P.] because it will provide immersive and comprehensive instruction and services to meet his specific needs at a level that previous placements have not . . . The Public Separate School provides [J.P.] with a Free and Appropriate Public Education in the least restrictive environment." Doc. 31-17 at 1.

The day after receiving this notification, Ogden filed her third Due Process Hearing Request challenging that placement. *Id.* On September 25, 2019, she filed an Amended Due Process Complaint. *Id.* at 360. On January 30, 2020, the Administrative Hearing Commissioner (AHC) after a hearing issued a 70-page Order denying her challenge and adopting the IEP placing Plaintiff at Trails West. *Id.* at 425. That Order is challenged in Count 1 of Plaintiff's Complaint and subject to judicial review under 20 U.S.C. § 1415(i)(2).

### 3. Findings and Decision of the Administrative Hearing Commissioner (AHC)

The AHC received testimony and other evidence at a hearing before affirming the IEP Team's decision. She received testimony from many witnesses, including Plaintiff's classroom teachers, occupational and physical therapists, caseworkers, speech pathologists, special education teachers, neurologists, psychologists, and school administrators. *Id.* at 365-67. She also received testimony from an expert retained by Plaintiff, Dr. Peter Blanck, Ph.D., who testified that Plaintiff was making some progress at Kentucky Trail and recommended against placement at Trails West. *Id.* at 371. The Court will not recount each of these witnesses' testimony or relationship with Plaintiff except when necessary.

At the hearing, Plaintiff primarily objected to the IEP Team's contention that he was not making appropriate progress on his IEP goals in light of his circumstance and that Trails West was the least restrictive environment ("LRE") where he could make such progress.

As to Goal 1, the AHC found that Plaintiff "was making minimal progress" but "was having a difficult time in the extended school year and was unable to maintain attention for more than 30 seconds." The evidence showed Plaintiff improving his ability to maintain attention between May and June 2018, but at no point was he able to maintain his attention for more than 30 seconds. *Id.* at 379. However, by December 2018, his earlier progress had slowed or been wholly erased. *Id.* The AHC found that his "time on task has not appropriately increased over the last 18 months." *Id.*

As to Goal 2, the AHC found that Plaintiff's progress "went up and down." *Id.* Plaintiff's ability to lift a piece of food to his mouth has progressed and regressed at different times since the goal was set, but as of the time of the hearing the AHC found "Student has not made any progress as he continued to require hand-over- hand assistance to redirect him to return the eating utensil to

the tray. Further, Student had reverted back to trying to grab the food rather than look for and use the utensil." *Id.* at 380.

As to Goal 3, the AHC received testimony from Plaintiff's occupational therapist that on some days Plaintiff was capable of using touch to communicate what objects he wishes to interact with, and on other days was totally incapable, and that his instructor could not predict how he will perform any given day. *Id.* at 382-83. The AHC found that although Plaintiff had made some progress, it "cannot necessarily be attributed to the services provided at the District because he has been in a consistent environment at home and school and has physically developed." *Id.* at 383. The AHC also noted that Plaintiff was not progressing toward "the next logical step of the goal", which was to reach out to pictures to communicate his desires, as opposed to toys. *Id.* As to Goal 4, the AHC received testimony that Plaintiff did not show readiness to meet this goal and in fact regressed from the date of his IEP to October 2019. *Id.* at 383-84.

Finally, as to Goals 5 and 6, which involved his ability to sit upright and travel using a reverse rolling walker, respectively, the AHC received testimony that he had met both goals. However, the AHC noted that his instructors believed this was due to natural physical development and maturation, not due to instruction.

The AHC found that Plaintiff was already in the most restrictive environment offered by Kentucky Trail. *Id.* at 422. Plaintiff was the least functioning student in the District in that he received all services in isolated special education settings and did not interact with other students, even the other disabled students in his classroom, except at recess and in the hallways. The AHC characterized Plaintiff as becoming "more and more isolated" because of his individual programming and as totally incapable of functioning with other students because it was overstimulating. *Id.* He noted Hoots' testimony that although Plaintiff was healthier than he was

Case 4:20-cv-00189-NKL   Document 226   Filed 08/13/21   Page 8 of 34

when he arrived at Kentucky Trail, his IEP progress was "very minimal and inconsistent" with regard to functional activities. *Id.* at 376-78. Overall, the AHC found that Plaintiff was receiving "little benefit" from his placement at Kentucky Trials and agreed with the District that it was not appropriate to implement Plaintiff's IEP at Kentucky Trail. The AHC found that Trails West was the least restrictive environment where Plaintiff could make appropriate progress toward his IEP Goals. *Id.* 423-24.

The AHC reviewed the testimony and report of Dr. Blanck, Plaintiff's retained expert. Doc. 28-2 at 371-72. Placing the dispute in a racial and historical context, Blanck testified that African American students like Plaintiff often face conscious or unconscious bias in the classroom from educators who underestimate their capabilities. Doc. 171-2 at 32 (Blanck Report). He testified as to the benefits of including Plaintiff in a mainstream school as opposed to the harms of segregating Plaintiff at Trails West and noted that African American students are more frequently segregated than white students in Missouri. *Id.* The AHC heard but did not assign much weight to Blanck's testimony. Doc. 28-2 at 412. The AHC noted that Blanck only met Plaintiff in person one time, does not have a degree in education or special education, did not talk to any of Plaintiff's teachers, and had never visited an MSSD school or observed Plaintiff at Kentucky Trail. *Id.* at 371-72

### B. Facts relating to the Retaliation Claim

### 1. Mandatory Reporting

Missouri law requires school employees to report suspicion of abuse or neglect of students to the Children's Division of the Missouri Department of Social Services. RSMo. § 210.115.1. The District requires all employees to attend annual trainings regarding mandated reporting of suspected child abuse. The District asks staff members who suspect a student is being abused to

make a child abuse report to the Children's Division and to afterward inform the school resource officer, in this case Officer Rachel Pruitt.

Six reports were filed with the Children's Division by District employees against Plaintiff's foster mother, Alisha Ogden, between November 14, 2019, and June 9, 2020, regarding suspected abuse by Ogden against Plaintiff or one of her other foster children.

### a. November 14, 2019 Report

On November 14, 2019, Pruitt made a report to Children's Division regarding Plaintiff. because she was concerned that he was not being medicated properly, that the District did not have adequate diapers for Plaintiff because Ogden was not providing them, and that he was often arriving to school in a saturated diaper. Doc. 187-7 at 1. Pruitt made this report of her own accord, and she does not recall the outcome of the report. Doc. 187-6 at 8 (Pruitt Depo.). After meeting and discussing these issues with Ogden, an employee at Children's Division stated, "This worker has no concerns about [J.P.'s] care with Ms. Ogden" and closed the investigation. Doc. 187-7 at 4. Pruitt stated she did not know either Plaintiff or Ogden at the time she made this report. Doc. 187-6 at 15.

### b. January 6, 2020 Report

On January 6, 2020, Dr. Michelle Biondo, the building administrator at Cambridge Elementary School in the District was at the school although students were on winter break. Doc. 187-7 at 12. K.W., a child in care of Ogden, arrived at the school alone and told Biondo that she did not feel safe at home. *Id.* She asked Biondo to not contact Ogden "because she would be mad." Biondo contacted the child's case worker at the Children's Division and Officer Rachel Pruitt, the District school resource officer. *Id.* Biondo reported the incident to the Children's Division because she suspected child abuse and neglect. *Id.* The Children's Division did not proceed with an

10

investigation based on her report. *Id.* at 13. Biondo stated that when she made the report, she did not know who Plaintiff was, did not know of any due process hearing or reports involving Plaintiff or Ogden, and had not made any other reports involving Plaintiff or anyone else in Ogden's care. Doc. 187-8 at 3 (Biondo Affidavit).

### c. January 13, 2020 Report

Cassandra Gabauer is a special education paraprofessional at the District who was assigned to work with M.W., one of Ogden's foster children, during the 2019-2020 school year. On January 13, 2020, she observed that M.W. had a deep fingernail mark on her left thumb and a circular bruise on her top right forearm. Doc. 187-7 at 34. Because M.W. is nonverbal, she was not able to tell Gabauer how she received those injuries. Doc. 187-5 at 2 (Gabauer Affidavit). Gabauer, suspecting child abuse, reported the injuries to the Children's Division. 187-7 at 34. The Children's Division accepted her report but then downgraded the report to an "assessment" and did not investigate further. *Id.* at 35. Gabauer stated that when she made the report, she had no knowledge of Plaintiff's due process hearing or any litigation related to Plaintiff or Ogden. Doc. 187-5 at 3-4.

### d. January 28, 2020 Report

On January 28, 2020, Hart, a special education teacher, reported to her supervisors as well as Officer Pruitt that Plaintiff had come to school that day with a saturated diaper soaked in urine and with dried feces stuck to his skin. Doc. 187-2 at 5 (Hart Affidavit and Report). Hart had the impression that the only way this could have happened was if he was not fully cleaned by his caretaker at home after a bowel movement. Doc. 187-2 at 2. Hart, suspecting child neglect, made a report to the Children's Division via its online portal. Doc. 170-2 at 7. Hart stated that when she made this report, she had no knowledge of any other reports by district employees against Ogden, although she had discussions with Officer Pruitt about Plaintiff being sent to school without the

proper supplies for cleaning and hygiene. *Id.* at 8. The Children's Division did not move forward with an investigation of Ogden based on Hart's report, which surprised Hart. Doc. 170-2 at 7.

### e. March 4, 2020 Report

On March 4, 2020, Gabauer again observed bruises on the arms of M.W., the child she was working with that schoolyear. Doc. 187-7 at 49. Gabauer, again suspecting child abuse, reported the injuries to the Children's Division. *Id.* Gabauer stated that when she made the report, she had no knowledge of Plaintiff's due process hearing. A Children's Division employee interviewed Gabauer regarding her report one day later. *Id.* One day after that, on March 6, 2020, Gabauer informed that employee that she had observed a new bruise on M.W.'s arm. *Id.* at 50. Based on its investigation, Children's Division concluded that M.W. was not in danger and did not move forward with its investigation. *Id.* at 50-51.

### f. June 9, 2020 Report

On June 9, 2020, Pruitt reported to Children's Division that K.W. had an ongoing issue of running away from Ogden's home and that Ogden did not have the ability to monitor K.W.'s location or keep the child at home. Doc. 187-7 at 96-101. She reported that on June 9, 2020, a law enforcement officer found K.W. locked out of the house, not wearing shoes, and walking to a gas station on a busy street because he was hot and thirsty. *Id.* Upon returning K.W. to Ogden's house, the officer heard from one of the other foster siblings that he or she was not actually locked out and just wanted to get out of the house after being grounded. *Id.* at 98. The foster sibling told the officer she was "in charge of [K.W.] and the other children" while Ogden was out of the house. *Id.* Based on the report, the Children's Division did not proceed with an investigation. *Id.* at 100.

### 2. Knowledge of Reports Among IEP Team

Hoots was advised of the six mandated reports after the reports were made because she was the Director of Special Education and the students who were the subject of the reports were all in the special education program. Doc. 185-1 at 2 (Hoots Affidavit). However, she never filed a mandated report herself. *Id*.

## II. Legal Standard

Plaintiff brings two claims in this litigation: (1) an appeal from the decision of the AHC affirming the IEP Team's decision to place him at Trails West; and (2) a retaliation claim. On appeal, the decision of the AHC is subject to review under the standard set forth by the IDEA. The retaliation claim is subject to a summary judgment standard.

### A. Standard of Review for Administrative Appeal

In reviewing the determination of a state administrative hearing commission's resolution of an IDEA claim, a district court must render an independent decision based on the preponderance of the evidence in the administrative record. *C.B. v. Special School Dist. No. 1*, 636 F.3d 981, 988 (8th Cir. 2011); *see also* § 11:310. Standard of review; deference to administrative findings, 3 Americans with Disab. Pract & Compliance Manual. However, it must also give due weight to the administrative proceedings and not substitute its own notions of sound educational policy for those of the school authorities which they review. *Bd. of Educ. v. Rowley*, 458 U.S. 175, 205-06 (1982); *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000); *T.B. v. St. Joseph Sch. Distr.*, 2011 WL 13189762, at *1 (W.D. Mo. Apr. 26, 2011), *aff'd*, 677 F.3d 844 (8th Cir. 2012). The Court should give deference to the hearing office who had the opportunity to observe the demeanor of witnesses and make credibility determinations. *Strawn*, 210 F.3d at 958. "Judicial review of administrative proceedings under the IDEA is limited because judges are not trained educators." *E.S. v. Indep. Sch. Dist. No. 196*, 135 F.3d 566, 569 (8th Cir. 1998). The standard of review, then,

13

falls somewhere between a deferential "substantial evidence" standard often seen when reviewing agency decisions and a non-deferential *de novo* standard. *See* Daniel W. Morton-Bentley, *The Rowley Enigma: How much Weight is Due to IDEA State Administrative Proceedings in Federal Court?*, 36 J. Nat'l Ass'n Admin. L. Judiciary 428 (2016). Any review of an IEP under the IDEA must turn on whether the IEP is reasonable, not whether the court regards it as ideal. *Albright as Next Friend of Doe v. Mountain Home Sch. Dist.*, 926 F.3d 942, 948 (8th Cir. 2019) (quoting *Endrew F. ex rel. Joseph F. v. Douglas City. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017)).

### B. Standard of Review for Motion for Summary Judgment

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

### A. Motion for Judgment on the Administrative Record on Plaintiff's IDEA Claim— Count 1

Plaintiff argues the AHC's decision affirming the placement decision of the IEP Team must be overturned because it was not supported by the evidence and was inconsistent with the IDEA and Missouri law. Specifically, Plaintiff in his Complaint argues the AHC (1) improperly characterized his due process objection as an objection concerning his proper IEP and placement; (2) failed to employ the correct legal standard of a free and appropriate public education ("FAPE") in light of his progress meeting his IEP goals; (3) improperly found that his placement at Trails West was "not more restrictive than necessary" since he was making progress at Kentucky Trail; and (4) erred by deferring to the testimony of District staff. Doc. 173 at 7 (Second Amended Complaint). He asks the Court to overturn the AHC's decision on these bases under 20 U.S.C. § 1415(i)(2), which states "Any party aggrieved" by a decision or finding by an AHC under the IDEA "shall have the right to bring a civil action" in any state court or district court of the United States. The Supreme Court has limited the district courts' role in deciding IDEA appeals as follows:

> "[A] court's inquiry in suits brought under 1415([i])(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."

*Bd. of Educ. Of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-7 (1982). The District argues that it is entitled to judgment on the administrative record because it and the AHC have complied with the procedures set forth in the IDEA and that its challenged IEP, which calls for placement at Trails West, is reasonably calculated to enable Plaintiff to receive educational benefits.

Plaintiff does not lodge a broad objection to the proposed IEP. Rather, the dispute between the parties is confined to a single issue: whether the decision in the IEP to move Plaintiff from

15

Kentucky Trail to Trails West was reasonably calculated to enable him to receive educational benefits appropriate in light of his circumstances and comported with the IDEA. In Plaintiff's words, "the parties do not disagree on J.P.'s goals and related services, but rather *where* the IEP should be implemented." Doc. 168 at 11. Plaintiff believes that placement at Trails West is improper because he is entitled to be placed in the least restrictive environment possible where he is able to receive a FAPE. Plaintiff argues that this environment is Kentucky Trail, where he was making progress on or had completed his IEP goals. The District characterizes Plaintiff's progress at Kentucky Trail as non-existent or minimal, but in either case insufficient to support his continued placement there. The District asserts, and the AHC agreed, that Plaintiff would only be able to receive a FAPE at Trails West.

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F*, 137 S. Ct. at 999; *Albright.*, 926 F.3d at 948. Such progress must be more than *de minimis*. *Id.* at 1000. At the administrative hearing, the District asserted that although Plaintiff was receiving the best instruction Kentucky Trail could provide, the progress was *de minimis* at best. Doc. 28-2 at 398 ("Student will have no educational benefit or 'de minimis' at best if he stays at Kentucky Trail."). The AHC further found that Trails West "could immediately pick up Student's IEP and implement it, whether other placement options could not." *Id.* at 424.

Plaintiff, conversely, asserts he "has achieved or made significant progress on every one of" his IEP goals at Kentucky Trail and had in fact achieved Goals 1, 3, 5, and 6 "beyond a reasonable dispute." Doc. 168 at 7. The Court will first consider whether or not the record supports the AHC's finding that Plaintiff was not making more than minimal progress toward his six IEP goals at Kentucky Trail. It will then consider whether the placement of Plaintiff at Trails West

comports with the IDEA's presumption in favor of placement in the least restrictive environment. The Court's analysis is based on its independent review of the administrative record, although it has given due weight to the results of the state administrative proceedings. *See C.B.*, 636 F.3d at 988-89.

### 1. Progress Toward IEP Goals

Plaintiff's first goal was to increase his functional skills by engaging in certain manual activities for up to 5 minutes on 4 of 5 trials on 4 of 5 days by the end of the IEP year. Plaintiff was assessed on this task on five occasions between May and October 2018. On two occasions he was characterized as making "slow progress" and on three occasions he was characterized as making "no progress." Doc. 29-27 at 28. On one "slow progress" occasion, he was not able to maintain attention for more than 30 seconds. On the other "slow progress" occasion, he maintained attention to a task for 31.3 seconds, although he continued "to be easily distracted even when engaged in a preferred activity such as buttons and music." Based on these measurements, the AHC found he was far short of achieving the 5-minute benchmark, was not exhibiting a positive trendline, and had thus not made more than *de minimis* progress toward this goal. Plaintiff characterizes his own progress as "significant", but the Court on this record concurs with the AHC that his progress toward Goal 1 cannot be characterized as more than *de minimis*.

Plaintiff's second goal was to, essentially, feed himself with an eating utensil and thereafter return the utensil to his food tray on 4 of 5 occasions on 4 of 5 days. Plaintiff was assessed on this task on five occasions between May and October 2018. On four occasions he was characterized as making "no progress." On one occasion he was characterized as making "slow progress." Doc. 29-27 at 30. On the "slow progress' occasion, Plaintiff had a 70% chance of success of taking a bite of food from a pre-loaded spoon but did not demonstrate an ability to grasp the spoon from the

tray or return it after taking a bite—on most occasions, he would simple drop the spoon after taking the bite. *Id.* Based on these assessments, the AHC found that Plaintiff's progress "went up and down" but that overall no more than minimal progress has been made. Plaintiff argues he has met "2/3rds" of this last goal, but the Court on this record sees no evidence of this amount of progress. Plaintiff at most demonstrated limited progress on 1 of 5 days, and it is far from clear that this day of limited progress represents sustainable progress toward achieving this goal. On this record, the Court concurs with the AHC that Plaintiff's progress toward Goal 2 cannot be characterized as more than *de minimis*.

Plaintiff's third goal was to improve his language skills by using eye gaze or touch to choose between activities on 2 out of 3 opportunities on 3 consecutive assessment days. Plaintiff was assessed on this task on three occasions between April and October 2018. Doc. 29-27 at 32. On the first occasion, he made a choice via eye gaze on one of three opportunities, although it was "difficult to determine if he [was] making a definite choice." On the second occasion, he seemed to make a choice half of the time. On the third occasion, the assessor noted only that his ability to choose "depends on the day." They said "[a]t his best, [J.P.] will reach for a preferred activity consistently. Some days he will refuse to make a choice at all. Most frequently, he will reach for both items 50% of the time, reach for one 25% of the time, and make a choice with eye gaze 25% of the time." Based on these assessments the AHC found Plaintiff made some progress toward this goal but also could not determine whether that progress was attributable to instruction he received at school. Although Plaintiff's progress toward this goal does not seem to be on a linear path and may indeed be regressing—the assessor, for their part, seems to believe Plaintiff's performance on any given day is a matter of pure chance. On this record, the Court finds that Plaintiff is not progressing toward this goal and that any perceived progress is *de minimis*.

18

Plaintiff's fourth goal was to use switches to ask for more, make choices, and "operate cause/effect activities" on 2 out of occasions on 3 consecutive assessment days. Plaintiff was assessed on this task on 3 occasions between April and October 2018. On the first two occasion, he was not making progress. On the third occasion, he was able to play music on a "Big Mack" device by applying pressure to a button. According to the assessor, he "loves" the device, and will independently maintain pressure on it with his hands or chin. Doc. 29-27 at 34. A District staff member characterized Plaintiff as having "a slightly positive trendline" solely as to his ability to press a switch to play music, but that the trendline is going down on this goal in other ways. Doc. 28-3 at 96. Based on these assessments, the AHC found Plaintiff was not showing progress because although he is excited by the music-playing Big Mack device, he is not making the cause/effect connection that is the essence of this goal. The AHC stated that he was only independently pressing the button seven percent of the time, which was a regression from earlier reporting periods. Plaintiff asserts that it is "very likely" that he has achieved Goal 4. The Court on this record finds no basis for that assertion. Rather, the Court concurs with the AHC that Plaintiff is not making more than minimal progress toward achieving Goal 4.

Plaintiff's fifth goal was to be able to sit upright in a chair for five minutes while performing functional activities and to be able to stand with assistance for two minutes on 2 of 3 occasions for 3 out of 4 consecutive assessment days. He was only assessed twice on this goal, both times in May 2018. On the first assessment, he was able to sit upright in a classroom chair for an average of 2 minutes and 15 seconds, sit upright in an adapted chair for 4 minutes, sit upright in a wheelchair for 10 minutes, and stand with assistance for an average of 1 minute and 40 seconds. On the second assessment, he was able to sit upright in a classroom chair for an average of 1 minute and 21 seconds, sit upright in a wheelchair for over 10 minutes, and stand with

19

assistance for an average of 1 minute and 56 seconds. Doc. 28-27 at 36. Based on these two assessments, the AHC found that he had met this goal but also noted that instructors did not believe it was due to their instruction so much as natural physical development. The Court concurs with the District and Plaintiff that he is making progress on Goal 5 but also finds the progress is unrelated to the instruction he is receiving at Kentucky Trail.

Plaintiff's sixth and final goal was to demonstrate increased locomotion by walking 50 feet with a reverse rolling walker while steering around obstacles and without the need for verbal cues to maintain grip on the walker on 2 out of 3 occasions on 3 of 4 assessment days. He was only assessed twice on this goal, both times in May 2018. On his first assessment, he could walk an average of 40 feet with his walker with minimal to moderate assistance but with frequent verbal and tactile clues to maintain grip on the walker. On the second assessment, he was able to walk more than 150 feet on two occasions, but still required physical and verbal reminders to keep gripping his walker. Doc. 29-27. Based on these two assessments, the AHC found that he had "mastered" this goal. Doc. 28-2 at 402. Plaintiff walks with handheld assistance and no longer utilizes a wheelchair or walker. Doc. 28-4 at 209.

The AHC also considered other evidence relating to Plaintiff's progress toward these six goals at Kentucky Trail. It accounted for testimony from District staff that Plaintiff has in fact "shown regression in the big picture" over the last three years. Doc. 28-4 at 384. After careful consideration of the entire record, the Court finds by a preponderance of evidence in the administrative record that Plaintiff has not made more than minimal progress toward IEP Goals 1, 2, 3, or 4. In addition, although he has made more than minimal progress toward Goal 5 and mastered Goal 6, this progress is the result of natural maturation and physical development, not the District's instruction. Kentucky Trail, despite mustering substantial special education resources

20

on Plaintiff's behalf, cannot provide him an environment where he can make more than *de minimis* progress toward his remaining IEP goals.

### 2. Least Restrictive Environment

The District argues that in light of the AHC's findings as to Plaintiff's IEP progress, placement at Trails West was appropriate because he was not making progress toward his IEP goals at Kentucky Trail. The IDEA provides that children with disabilities must be educated alongside non-disabled children "to the maximum extent appropriate" and that removal of a child from a mainstream setting should occur "only when the nature or severity of the disability of a child is such that an education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). A disabled child's school placement must be based on their IEP. 34 C.F.R. § 300.114(b)(2). This strong preference in favor of mainstream schooling is known as the "Least Restrict Environment" presumption. *See T.F. v. Special Sch. Dist. of St. Louis Cnty.*, 449 F.3d 816, 820 (8th Cir. 2006) ("The statute . . . [reflects] a strong preference that disabled children attend regular classes with non-disabled children[.]") (internal quotations omitted). However, the presumption in favor of mainstream schooling does not bar the placement of students at schools like Trails West when appropriate. "[T]he appropriate yardstick is whether the child, with appropriate aids and services, can make progress toward the IEP's goals in the regular education setting." *L.H. v. Hamilton Cty. Dep't of Educ.*, 2016 WL 6581235, at *1 (E.D. Tenn. Nov. 4, 2016).

In this case, the IEP team decided that placement at Trails West was appropriate given Plaintiff's particular cognitive level, needs, and the historical data, all of which led it to believe that it could not advance Plaintiff's IEP goals at Kentucky Trail even with appropriate aids and

services on hand. The AHC found that the evidence supported the IEP Team's decision. Doc. 28-2 at 424.

Plaintiff asserts that placement at Trails West runs afoul of the IDEA's LRE presumption. He cites chiefly to *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983), wherein the Sixth Circuit held that placement of a disabled child at a separate school is appropriate only when that student is (1) receiving no benefit from inclusion at their mainstream school; (2) the benefits of special placement far outweigh the benefits of inclusion; and (3) the student is disruptive in the mainstream setting. Plaintiff argues that under *Roncker*, placement at Trails West is categorically barred because there is no evidence that he is disruptive and strong evidence that he has benefitted from inclusion at Kentucky Trail.

The Eighth Circuit in *Pachl v. Seagren*, 453 F.3d 1064 (8th Cir. 2006), found that a student could be removed from a mainstream setting only when (1) any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not be provided in the non-segregated setting; (2) the student would not benefit from mainstreaming; and (3) the student is a disruptive force in the non-segregated setting. *Id.* at 1068. However, it also "emphasized that the statutory language 'significantly qualifies the mainstreaming requirement by stating it should be implemented to the maximum extent appropriate' . . . and that it is inapplicable where education in a mainstream environment cannot be achieved satisfactorily." *Id*. at 1067-68 (citing *A.W. v. Northwest R-1 Sch Dist.*, 813 F.2d 158, 163 (8th Cir. 1987)).

Plaintiff, although at a mainstream school, is already totally segregated from non-disabled students in that he spends no time with his non-disabled peers outside of incidental interactions in the hallways and at recess. Even when these glancing interactions do occur, he does not meaningfully engage with his peers outside of occasional eye contact and a smile. Doc. 28-2 at

421. Testimony from District staff establishes that Plaintiff on a pure sensory level cannot handle being in the cafeteria or in the regular classroom with other students and that he cannot participate in music class, art class or assemblies. Doc. 28-3 at 287. When he is around peers in a general education setting, "he responds by doing things like dropping to the floor," putting his hands over his ears, and vocalizing in an unintelligible and uncontrolled manner. *Id.* at 33. He also frequently vomits and bites staff, requiring them to wear bite guards. Doc. 28-2 at 401. As such, although he is not a disruptive force at Kentucky Trail on a day-to-day basis, a preponderance of evidence suggests this is only because he has no meaningful interaction with or exposure to other students.

Plaintiff points to alleged benefits from his limited interaction with non-disabled peers— for instance, that at the library a peer saw him and said "I know that kid. He goes to school with me!", and in response Plaintiff briefly made eye contact with the student. Doc. 28-3 at 154. Even assigning this single anecdote (supplied by Plaintiff's own expert, Dr. Blanck) maximum weight, there is no evidence in the record that Plaintiff receives any meaningful benefit from his placement at Kentucky Trail by way of socialization with non-disabled peers. Plaintiff also points to testimony from Dr. Blanck, who has testified that research shows that students like Plaintiff generally benefit from being in "integrated" settings with non-disabled peers and suffer when they are placed in settings with only disabled peers. Doc. 190 at 23-24. However, this ignores that Plaintiff is by necessity nearly totally segregated from his non-disabled peers in his current setting. Given the fact of his segregation in his current setting, his placement at a new school set aside for severely disabled students would not isolate him any further. Rather, to the extent that such placement could allow Plaintiff to learn alongside other students in some capacity, it would seem likely to increase, not decrease, his ability to reap the benefits of peer socialization.

23

A preponderance of the evidence supports the AHC's finding that the benefits of placement at Trails West far outweigh whatever benefits he receives from his current placement. District staff have testified that Kentucky Trail simply cannot provide the distraction-free environment that Plaintiff requires, even in the special education classroom that he is permanently assigned to. Doc. 28-3 at 110. This is because he must share the special education room with other disabled students who do not take lessons alongside him but ingress and egress from that classroom throughout the day, creating an untenable series of distractions. Trails West is a smaller school that is designed to offer a quieter environment with fewer distractions. It can provide "wrap-around services" for Plaintiff, where therapy and classroom instruction can be provided in a calmer setting. Trails West will also allow Plaintiff to actually learn alongside other students, something he is unable to do at Kentucky Trail. *Id.* at 111-12. Altogether, a preponderance of the evidence supports the finding that the benefits of placement at Trails West far exceed the benefit of continued placement at Kentucky Trail, that Plaintiff would likely be disruptive to other students at Kentucky Trail if he was ever with those other students, and that he is receiving no benefits of inclusion by virtue of his placement at Kentucky Trail for the simple reason that he is not in an inclusive setting at Kentucky Trail. The *Paschal* factors support the determination of the IEP Team that Kentucky Trail is not a setting where Plaintiff can make progress toward his IEP goals even given the full benefit of supplementary aids and services. A preponderance of the evidence supports the District's decision that Plaintiff's educational goals cannot be achieved satisfactorily in a mainstream environment like Kentucky Trail, and thus placement at Trails West is appropriate and permitted under 20 U.S.C. § 1412(a)(5)(A).

### 3. Resources Provided to Plaintiff in His Current Setting

Plaintiff argue in the alternative that even if this Court were to find that he has failed to make adequate progress toward his IEP Goals at Kentucky Trail, that this failure stems from the District's refusal to provide him adequate supplementary services that it must provide "in conjunction with regular classroom placement." 34 C.F.R. § 300.115. Plaintiff argues that the District "can train staff and/or pull J.P. out for instruction in small groups" or use itinerant teachers and a resource room "to allow such expertise and structure to assist J.P. in general education." He cites to two cases, *Oberti v. Bd. of Educ.*, 801 F. Supp 1392 (D. N.J. 1992), and *Greer v. Rome City Sch. Dist. B.*, 950 F.2d 688 (11th Cir. 1991), in support of the proposition that a school must attempt to provide itinerant teachers and specialized classrooms to supplement a general education experience before seeking a more restricting setting for a disabled student. Itinerant teachers are traveling schoolteachers who are specialized to provide instruction to profoundly disabled students.

*Oberti* and *Greer* confirm that a school must bring to bear its supplemental aids and services on behalf of a disabled student before shifting them out of a regular classroom environment. *Greer*, 950 F.2d at 696 ("[B]efore the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction . . . "); *Oberti*, 801 F. Supp at 1407 ("It is now time for the School District . . . to avail itself of the resources that have enabled school districts around the country and within New Jersey successfully to educate children with moderate to severe disabilities within the matrices of regular education classes.").

In *Oberti* and *Greer*, the courts found that a student could not be taken out of a regular classroom before the school district had exhausted its full suite of supplemental aides and services that might allow the student to remain. Here, Plaintiff has already been fully removed from a regular classroom environment. Due to Plaintiff's profound intellectual and physical disabilities and total inability to interact with peers, his placement. in a regular classroom setting is not a viable alternative—indeed, nobody in this litigation suggests he be placed in a regular classroom.

Furthermore, although Plaintiff asserts the District must provide him with a resource room and an itinerant teacher before placing him in a more restrictive environment, the record makes clear that the District has already provided him full-time one-on-one services from a team of trained therapists, paraprofessionals, and instructors, advanced assistive technology, and a specially-designed independent workspace meant to minimize sensory input in the best-resourced room available. There is no reason to think that layering a new room or a new employee on top of the aides and services already provided will set Plaintiff's IEP progress on a different trajectory. To the extent that Plaintiff is essentially arguing that he is entitled to better special education services than what he is currently receiving, such services are more likely to be found at a school dedicated to educating severely disabled students than in a mainstream setting. Trails West is able to employ teachers who are trained and credentialed specifically to instruct profoundly disabled students. Doc. 28-2 at 405. Kentucky Trail, by comparison, employs teachers with degrees in special education but without the same specialization in profound disabilities. *Id.* at 402 ("While there is a degree in special education for severe and profound disabilities, it is a very specialized degree, and Hoots is not sure if in her 20 years in the public school setting she has hired anyone with that type of degree."). The Court finds that Plaintiff's failure to make appropriate progress on his IEP Goals is not due to the District's failure to provide supplementary aides and services.

### 4. Conclusion

For the reasons stated above, a preponderance of the evidence supports the finding that the State has complied with the procedures set forth in the IDEA and that the challenged IEP—including its placement of Plaintiff at Trails West—is reasonably calculated to enable the child to receive educational benefits appropriate in light of the circumstances. *Rowley*, 458 U.S. at 206-07. Furthermore, the placement of Plaintiff at Trails West comports with Eighth Circuit precedent regarding the LRE presumption as set out in *Paschal* given his particular circumstances and needs. As such, the District's Motion for Judgment on the Administrative Record, Doc. 184, is granted. Plaintiff's Motion for Judgment on the Administrative Record, Doc. 186, is denied. Count 1 of Plaintiff's Second Amended Complaint is dismissed.

### B. Motion for Summary Judgment on Plaintiff's Retaliation Claim—Count II

To establish a *prima facie* retaliation claim under the ADA or § 504 of the Rehabilitation Act, Plaintiff must show that (1) he engaged in a statutorily protected activity; (2) an adverse action was taken against him; and (3) a causal connection between the protected activity and the adverse action. *Bradley ex rel. Bradley v. Ark. Dep't of Educ.*, 443 F.3d 965, 976 (8th Cir. 2006); *see also Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 660 (2d Cir. 2009) (elements of a retaliation claim are identical for ADA and § 504 claims). When there is no direct evidence of retaliation, as is the case here, an inference of retaliation must be created using the *McDonnell-Douglas* burden-shifting framework. *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the Plaintiff first has the burden of establishing the elements of his claim. Then, the burden of production shifts to the District to show a legitimate, non-discriminatory reason for their adverse action. Then, the burden shifts back to the Plaintiff to show the District's proffered reason was pretextual.

Plaintiff claims the exercise of his procedural safeguards afforded to him under the IDEA was a statutorily protected activity, that the child abuse reports made by various school district employees and the school resource officer were adverse actions, and that the reports were caused by Plaintiff's invocation of his IDEA rights in the form of filing due process complaints to halt his placement at Trails West. The District moves for summary judgment on the following bases: (1) it took no adverse action against Plaintiff; (2) there is no causal connection between the mandated reports and any protected activity; (3) the reports filed by District employees were legitimate, non-discriminatory, and mandated under Missouri law; (4) the District is entitled to statutory immunity in the absence of any evidence of bad faith; and (5) the retaliation claim is not exhausted as required under the IDEA. For purposes of this Motion only, the Court assumes that the filing of child abuse reports by District employees against Ogden were adverse actions, that Plaintiff engaged in a protected activity by invoking his IDEA rights, and that the claim survives the exhaustion requirements of the IDEA.

### 1. Causation

A retaliation claim requires a but-for causal connection between a plaintiff's protected activity and a defendant's adverse action. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016). Usually, more than a temporal connection between the protected activity and the adverse action is required to present a genuine factual issue on causation. *Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005). Any inference of causation deriving from temporal proximity disappears altogether when the time gap between the protected activity and the adverse action is measured in months. *Littleton v. Pilot Travel Ctrs. LLC*, 568 F.3d 641, 645 (8th Cir. 2009). Plaintiff argues that District employees would not have filed child abuse reports against Ogden if Ogden had not filed due process complaints protesting Plaintiff's new placement at Trails West. Plaintiff

points to the temporal proximity between her due process complaints and the child abuse reports as evidence establishing causation.

J.P. began to attend Kentucky Trail in February 2018. Doc. 28-2 at 20-21. In the spring of 2018, the IEP Team began discussing with Ogden a change in placement from Kentucky Trail to Trails West. Doc. 29-1 at 3. On August 23, 2019, the IEP team formally proposed that change. Ogden filed due process complaints on October 24, 2018, May 24, 2019, and August 30, 2019. Doc. 29-1 at 2-3. The AHC issued its decision on January 31, 2020. District employees made child abuse reports against Ogden on November 14, 2019, January 6, 2020, January 13, 2020, March 4, 2020, and June 9, 2020. Doc. 187-7.

Plaintiff asserts that his due process complaints—filed between October 2018 and August 2019—were the but-for cause of the child abuse reports made between November 2019 and June 2020. There is roughly a two-and-a-half-month gap between Plaintiff's third Due Process Complaint (August 30, 2019), and the first child abuse report (November 14, 2019). However, this November report was made by Officer Rachel Pruitt, who stated that at the time she had no idea who Plaintiff or Ogden were or that there was an ongoing dispute between Ogden and the school over his IEP. Doc. 187-6 at 15. As such, there is no possibility that Plaintiff's complaints were the but-for cause of Pruitt's November 2019 report. Likewise, Biondo, who made a January 6, 2020, report against Ogden concerning one of Plaintiff's foster siblings, stated that she did not know who J.P. was or anything about the due process complaints. Doc. 187-8 at 2. For the same reason, Biondo's child abuse report could not logically have been motivated by a due process complaint she was wholly unaware of.  Likewise, Gabauer, who made a child abuse report on January 13, 2020, has also stated she had no knowledge of Plaintiff's due process hearing nor any litigation involving Plaintiff or Ogden.  In light of these uncontroverted statements, not until January 28,

2020—five months after Plaintiff's final due process complaint, was a child abuse report filed by any District employee who was potentially aware of the statutorily-protected activity in question. A five-month temporal gap between a protected activity and an adverse action precludes a reasonable fact finder from inferring retaliation based on temporal proximity. *Littleton*, 568 F.3d at 645; *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006).

As more time passes between the protected conduct and the adverse act, the inference of retaliation becomes weaker, and the plaintiff must produce stronger alternate evidence of causation. *Sims v. Sauer-Sundstrand Co*, 130 F.3d 341, 343 (8th Cir. 1997). In his briefing, Plaintiff marshals three alternative arguments to establish the causal link between his complaints and the child abuse reports: (1) the fact that the Children's Division declined to investigate three of the District employees' reports, made no findings of abuse after investigating the other two, and did not exhibit serious concern for the children in Ogden's care based on the reports; (2) a weak factual basis for the report concerning bruises on M.W.'s arm considering her penchant for self-harm and dearth of evidence that Ogden caused her injuries;[2] and (3) the generally adversarial relationship between Ogden and District employees. Plaintiff argues these facts create a genuine issue of material fact that precludes summary judgment on the issue of causation.

As a preliminary matter, only two District employees were aware of Plaintiff's due process complaints at the time they filed a child abuse report. The first was Hart, who filed a child abuse report on January 28, 2020. The second was Pruitt, who filed a child abuse report on June 9, 2020.[3]

---

[2] Plaintiff points to no evidence that Gabauer knew of Plaintiff's due process hearing nor of any litigation involving him or Ogden. Therefore, his second argument fails *ab initio* and will not be discussed further.

[3] Pruitt was not aware of the dispute being Ogden and the IEP Team when she filed her first report on November 14, 2019. Doc. 187-6 at 15. Therefore the Court only considers her second report in this context.

Therefore, the Court only considers whether there is evidence from which a reasonable fact finder could conclude that Hart or Pruitt would not have filed the child abuse or neglect reports but for Plaintiff's due process complaint.

As for Plaintiff's first argument, the fact that the Children's Division declined to take action after receiving Hart and Pruitt's reports does not create an inference that the due process complaints were the but-for cause of the child abuse reports. Under RSMo. § 210.115.1, any "teacher, principal or other school official . . . or law enforcement official" with "reasonable cause to suspect that a child has been or may be subjected to abuse or neglect or observes a child being subjected to conditions or circumstances which would reasonably result in abuse or neglect . . . shall immediately report to the division." The mandatory reporting statue does not suggest that a District employee must predict the likelihood that the Children's Division will investigate or act on the report or consider how previous investigations into a suspected abuser were resolved, assuming they even had that information. Rather, mandatory reporters are commanded to make a report whenever they have reasonable cause to suspect child abuse. The fact that Children's Division staff may not act on a report does not indicate that the reports were made for an improper purpose or that the reporters lacked reasonable cause to suspect child abuse. Furthermore, although the reports did not lead to any findings of abuse, there is no indication they contained false information, either. Under these facts, no reasonable fact finder could conclude that Pruitt or Hart lacked reasonable cause to *suspect* that Plaintiff was being neglected when he came to school with a soiled diaper and dried feces stuck to his skin or when K.W. was found locked out of his or her house, not wearing shoes, and walking to a gas station on a busy street because he or she was hot and thirsty. Absent some evidence that Hart or Pruitt did not have reasonable cause to suspect these children were neglected, there is insufficient evidence for a reasonable fact finder to conclude that

31

the filing of the abuse report would not have occurred but for the Plaintiff's due process complaints. This ruling is also consistent with the public policy reasons for requiring mandatory reporting of suspected child abuse or neglect.

Finally, Plaintiff argues that the fact of the adversarial relationship between Ogden and his IEP Team undermines the District's claim that its employees actually acted out of concern for her foster children and in fact supports a finding that they filed the abuse/neglect reports to retaliate against Ogden. Plaintiff claims that District employees mistreated Ogden and Plaintiff by, for instance, "[ganging] up" on her in IEP meetings, not providing proper services to Plaintiff, gossiping about Plaintiff and his siblings, and characterizing Ogden as aggressive, intimidating, and potentially violent.

As noted above, of the four individuals who made reports, only Hart and Pruitt had knowledge of the ongoing dispute between Ogden and Plaintiff's IEP Team at the time they filed their reports in January 2020 and June 2020, respectively. But even if they were aware of or participated in the alleged conduct toward Ogden and even if that creates an inference of animus, Hart and Pruitt still had an obligation to make child abuse reports under RSMo. § 210.135 when they had reasonable cause to suspect abuse or neglect. In lieu of any evidence that the factually accurate child abuse reports were not based on reasonable cause, a fact finder could not make the requisite causal connection between the reports and the Plaintiff's due process complaints. There is no genuine dispute that Plaintiff did come to school with dried fecal matter stuck to his skin on multiple occasions, and that K.W. ran away from home repeatedly and told a school employee they did not want to go back. In light of these facts, any animus on the part of District employees toward Ogden or Plaintiff himself cannot be regarded as the but-for cause of the child abuse

reports—instead, the but-for cause of those reports can be found in the plain text of RSMo. § 210.135.

For the reasons stated above, Plaintiff has not created a genuine issue of material fact as to the existence of the causation element of his retaliation claim. By itself, this is fatal to Plaintiff's retaliation claim because he has not made out the elements of his *prima facie* case. *See Hicks*, 509 U.S. at 511.

## Conclusion

For the reasons stated above, Plaintiff's Motion for Judgment on the Administrative Record or, in the Alternative, Summary Judgment on Count 1 of His Second Amended Complaint, Doc. 186, is denied. The District's Motion for Judgment on the Administrative Record or, in the Alternative, for Summary Judgment on Count 1 of Plaintiff's Second Amended Complaint and Motion for Summary Judgment on Count 2 of Plaintiff's Second Amended Complaint, Doc. 184, is granted. The decision of the AHC is affirmed, summary judgment is entered against Plaintiff on Count 2, and Plaintiff's Second Amended Complaint is dismissed with prejudice.

The District's Motion for Judgment on the Pleadings on Count 3 of Plaintiff's First Amended Complaint, Doc. 138, Motion for Summary Judgment or Judgment on the Administrative Record on Count 1 of Plaintiff's First Amended Complaint, Doc. 149, and Motion for Summary Judgment on Count 3 of Plaintiff's First Amended Complaint, Doc. 152, are denied as moot. Plaintiff's Motion for Summary Judgment or Judgment on the Administrative Record on Count 1, Doc. 156, is denied as moot.

**IT IS SO ORDERED**.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

33

Dated: <u>August 13, 2021</u>
Jefferson City, Missouri